UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

CHANNICA C.,                                         Case No. 21-CV-0127 (PJS/TNL)

              Plaintiff,

v.                                                                      ORDER

KEN CUCCINELLI or successor, Senior
Official Performing the Duties of the
Director of U.S. Citizenship and
Immigration Services; LESLIE TRITTEN
or successor, Minneapolis Field Office
Director of U.S. Citizenship and
Immigration Services; JEFFREY A.
ROSEN or successor, Acting U.S.
Attorney General; DAVID WETMORE or
successor, Chief Judge of the Board of
Immigration Appeals; EDWARD KELLY,
Board of Immigration Appeals Judge,

              Defendants.

---

Kelsey Hines and Marc Prokosch, PROKOSCH LAW, LLC, for plaintiff.

David W. Fuller, UNITED STATES ATTORNEY'S OFFICE, for defendants.

Plaintiff Channica C. brought this action to challenge the denial of the I-130 petition that she filed on behalf of her husband, Ath T. United States Citizenship and Immigration Services ("USCIS") denied the petition on the ground that Ath had previously entered into a fraudulent marriage for the purpose of obtaining immigration benefits. Channica appealed USCIS's denial to the Board of Immigration Appeals

("BIA"), which dismissed the appeal.  Channica then filed this action seeking review

under the Administrative Procedure Act ("APA").[1]

This matter is before the Court on the parties' cross-motions for summary

judgment.  For the reasons that follow, the Court grants the government's motion and

denies Channica's motion.

## I.  BACKGROUND

Ath T. is a native and citizen of Cambodia.  ECF No. 22 at 6.  In March 2006, Ath

married Angie T., an American citizen living in Minnesota, at a ceremony in Phnom

Penh.  Administrative Record ("AR") 69, 154, 297.[2]  After the wedding, Angie returned

to the United States, and Ath remained in Cambodia.  A few months later, Angie filed

an I-130 petition to establish Ath's eligibility to enter the United States; she also later

filed an I-129F "Petition for Alien Fiancé(e)."[3]  AR 297–98; AR 108–10.  USCIS approved

---

[1]Channica also conclusorily alleged a violation of her due-process rights.  Compl. at 22 ¶ 2.  Channica did not mention a due-process claim in her briefing or at oral argument, however, and any such claim is therefore forfeited.

[2]The Court cites to the page numbers at the bottom center of the administrative record.

[3]An I-130 petition "acts as a request for immigration authorities to formally recognize the validity of the marriage."  *Zerezghi v. USCIS*, 955 F.3d 802, 804 (9th Cir. 2020).  Although an I-129F petition is nominally intended for use by engaged couples, it may also be used in conjunction with an I-130 petition to permit the alien spouse "to enter as a nonimmigrant to await the immediate availability of an immigrant visa and to file for adjustment of status."  U.S. Citizenship & Immigr. Servs., *U.S. Citizen Petition for*

(continued...)

the petitions in September and November 2006, respectively.  AR 4, 108, 297.  Ath

obtained a K-3 non-immigrant visa in August 2007 and was admitted to the United

States on October 1, 2007.  AR 4.  In January 2007, about ten months after marrying Ath,

Angie gave birth to a child—a child who was not fathered by Ath, but by a man named

Jimmy T.  AR 496, 976.  Ath did not learn of the child until he arrived in the United

States the following October.  AR 980.

In September 2008, Ath filed an I-485 application for permanent residency.

AR 1704.  In support of this application, Angie and Ath, represented by counsel,

appeared for an interview in March 2009.  AR 1704.  At the interview, Angie and Ath

testified that they resided together (along with Angie's child) at 992 Earley Lake Curve

in Burnsville.  AR 5, 910.  Ath's driver's license bore this address, but Angie's expired

license indicated her address as 12100 23rd Avenue South in Burnsville.  AR 910.  Angie

testified that she had recently applied for a new license.  AR 910.  Angie also

acknowledged that she had an affair shortly after she married Ath, characterizing the

affair as "a bad mistake."  AR 910.

Following the March 2009 interview, USCIS referred the case for further

investigation, which eventually culminated in USCIS issuing a Notice of Intent to

----

[3](...continued)
*a Fiancé(e)*,
https://www.uscis.gov/forms/explore-my-options/us-citizen-petition-for-a-fiancee (last
visited Aug. 4, 2022).

Revoke ("NOIR") in June 2012.  AR 4.  In July 2013, USCIS revoked the I-130 and the

BIA dismissed Angie's appeal in September 2014.  AR 626, 814.

Meanwhile, Ath and Angie separated in June 2009.  AR 154.  The following

month, Ath and Channica met and began a relationship.  AR 374.  Ath and Channica

had a child together in May 2010.  AR 374.  Angie and Jimmy had another child together

in December 2012.  AR 978.

Angie and Ath divorced in February 2015, and Channica and Ath married a few

weeks later.  Compl. ¶¶ 65–66.  Channica then submitted an I-130 petition on Ath's

behalf.  AR 1702.  In May 2016, USCIS issued a Notice of Intent to Deny ("NOID") on

the basis that Ath had entered into a sham marriage with Angie for the purpose of

obtaining immigration benefits.  AR 1702–08.  USCIS denied Channica's I-130 petition in

January 2017, and the BIA dismissed her appeal in October 2020.  AR 909, 1274.

Channica then filed this action.

## II.  ANALYSIS

### A. Standard of Review

Judicial review of an administrative agency's final determination is governed by

the APA.  5 U.S.C. § 702; *Iyawe v. Garland*, 28 F.4th 875, 881 (8th Cir. 2022).  Courts will

set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A).  "This is a highly deferential standard

of review, and its scope is narrow." *Iyawe*, 28 F.4th at 881.  Under this standard, courts

may not substitute their judgment for that of the agency, but instead must determine

whether the agency made a clear error of judgment.  *Id.* (citation and quotation marks

omitted).

Channica challenges the application of the marriage-fraud bar set forth in

8 U.S.C. § 1154(c).  Under § 1154(c), an I-130 petition must be denied if:

> (1) the alien has previously been accorded, or has sought to
> be accorded, an immediate relative or preference status as
> the spouse of a citizen of the United States or the spouse of
> an alien lawfully admitted for permanent residence, by
> reason of a marriage determined by the Attorney General to
> have been entered into for the purpose of evading the
> immigration laws, or (2) the Attorney General has
> determined that the alien has attempted or conspired to
> enter into a marriage for the purpose of evading the
> immigration laws.

The marriage-fraud bar is a mandatory, permanent ban that applies even if the

current marriage is bona fide and even if the alien spouse was never prosecuted for the

allegedly fraudulent marriage.  *Iyawe*, 28 F.4th at 879; *Osakwe v. Mukasey*, 534 F.3d 977,

979 (8th Cir. 2008) ("It goes without saying that the CIS's determination of marriage

fraud carries great consequences as an alien may be permanently ineligible to obtain an

I-130 visa even if he subsequently enters into a bona fide marriage with a U.S. citizen.").

For this reason, USCIS's decision to apply the marriage-fraud bar must be based on

"substantial and probative evidence" that the prior marriage was fraudulent.  8 C.F.R.

§ 204.2(a)(1)(ii); *Matter of Singh*, 27 I. & N. Dec. 598, 607 (BIA 2019).  This standard is "higher than a preponderance of the evidence and closer to clear and convincing evidence."  *Singh*, 27 I. & N. Dec. at 607.

### 1.  Incorrect Legal Standard

Channica contends that the agency applied an incorrect legal standard in adjudicating her petition.  This argument is meritless.  The BIA reviewed USCIS's determination de novo and recited the correct "substantial and probative evidence" standard.  AR 1274–75.  Moreover, while USCIS's denial did not explicitly recite the applicable evidentiary standard, the denial must be read in conjunction with the NOID, which recited the correct evidentiary standard and expressly recognized that the government has the initial burden to show fraud.  AR 1703 ("Where there is 'substantial and probative evidence' of prior marriage fraud in the record, the burden then shifts to the petitioner to overcome this evidence.").  Channica can certainly challenge the BIA's conclusion that there is substantial and probative evidence of fraud, but there can be no dispute that that the agency recognized and applied the correct standard and burden of proof.

Channica also contends that USCIS applied incorrect legal standards in earlier agency actions, such as the 2012 NOIR and the 2013 revocation of Angie's I-130 petition.  As the Court explained at oral argument, however, the decision under review in this

case is the BIA's 2020 dismissal of Channica's appeal of the denial of her I-130 petition.

Again, in making its decision, the BIA reviewed the record de novo and applied the

correct legal standard.  AR 1274–75.  Any alleged errors in previous proceedings not

under review here are therefore irrelevant.  *Cf. Iyawe*, 28 F.4th at 881 n.6 ("The Iyawes

also argue that the four previous denials were not based on substantial evidence and

that those denials continue to prejudice Simon.  But the focus of this appeal is the denial

of Alicia's petition, which—as we explain above—was based on 'substantial and

probative evidence' in the entire record, not on the mere fact that the earlier

applications had been denied.").

Channica compares this case to *Pitman v. USCIS*, 485 F. Supp. 3d 1349 (D. Utah

2020), in which the court held that the BIA's affirmance of the denial of the plaintiff's I-

130 petition was arbitrary and capricious.  *Pitman* is easily distinguishable, however.  In

*Pitman*, the NOID erroneously imposed the burden of proof on the petitioner to prove,

by clear and convincing evidence, that the beneficiary's previous marriage was *not*

fraudulent.  *Id.* at 1355.  Here, by contrast, the NOID expressly recognized that there

must be "substantial and probative evidence" of prior marriage fraud before the burden

shifts to the petitioner.[4]  AR 1703.  The only question before the Court, then, is whether

---

[4]Channica also takes issue with USCIS's statements that it is not clear that Angie and Ath "married for purposes of love and affection and with the intention of creating a life together."  *See, e.g.*, AR 631, 912.  While Channica is correct that "love and affection"

(continued...)

the BIA's determination that there was substantial and probative evidence of fraud was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The Court now turns to that question.

### 2.  Sufficiency of the Evidence

As noted, the BIA's decision to deny an I-130 petition under § 1154(c) must be based on "substantial and probative evidence" of marriage fraud.  *Iyawe*, 28 F.4th at 879.  "The central question in determining whether a sham marriage exists is whether the parties intended to establish a life together at the time they were married."  *Singh*, 27 I. & N. Dec. at 601 (citation and quotation marks omitted).

The BIA affirmed USCIS's finding that there is substantial and probative evidence that Ath and Angie's marriage was fraudulent, holding that "the circumstantial evidence of record, when considered cumulatively, supports the finding of marriage fraud."  AR 1275.  Having carefully reviewed the record, the Court cannot say that this conclusion was either arbitrary and capricious or a clear error of judgment.

The BIA primarily relied on evidence that Angie and Ath had relationships with other people during their marriage.  As noted, Angie had a child with Jimmy in

---

[4](...continued)
is not the relevant standard, the language is clearly surplusage, as the agency properly analyzed the evidence to determine "whether the parties intended to establish a life together at the time they were married."  *Singh,* 27 I. & N. Dec. at 601 (citation and quotation marks omitted).

January 2007; that was just ten months after Angie married Ath, which means that

Angie became pregnant with Jimmy's child about a month after marrying Ath.  Ath did

not learn of Angie's child until he arrived in the United States the following October.

Ath also admitted that Jimmy lived with them for a time in 2009.  ECF No. 22 at 26;

AR 465–66.  Angie and Jimmy went on to have another child in December 2012—the

second of Jimmy's children that Angie bore while married to Ath (although, in this case,

after Angie and Ath had separated).  For his part, after leaving Angie in June 2009, Ath

almost immediately became involved with Channica, and the two had a child together

less than a year later (in May 2010), again while Angie and Ath were still married.

These circumstances, which are undisputed, are themselves strong evidence that Angie

and Ath did not intend to establish a life together at the time of the marriage.  These

undisputed circumstances also provide ample support for the inferences that Angie's

only genuine romantic partner was Jimmy and that her relationship with Jimmy

continued throughout her marriage to Ath.[5]

_____

[5]Channica points to the affidavit of her brother Piphen, who avers that Jimmy's
relationship with Angie ended before the birth of their child.  AR 990–91.  According to
Channica, this affidavit is "overwhelming evidence" that Angie's relationship with
Jimmy was not continuous.  ECF No. 22 at 14.  It is evident that Piphen's assertions are
not based on personal knowledge, however, as he did not know of Angie's child until
after Ath arrived in the United States and initially assumed that Ath was the father.
AR 990 ("I was so surprised that after so long we haven't seen each other, Angie and
Ath already have a baby together.").

As for the remainder of the record:  Supporting documentation of Angie and Ath's relationship is fairly thin.  Angie and Ath were introduced through their families in 2000, and they supposedly developed a long-distance relationship through phone calls and correspondence.  AR 85, 976.  As USCIS noted, however, the record contains no evidence of any written communications predating the marriage.  AR 912.  The only evidence of correspondence between them is about a dozen or so emails spanning about four months in 2007 that largely concern Ath's efforts to get a visa.  AR 1029–38.  Their joint bank account shows minimal activity and, as USCIS found, "was created solely in an effort to show a co-mingling of assets," AR 913—itself an indication of fraud.[6]  *See Singh*, 27 I. & N. Dec. at 609 (deliberately attempting to deceive immigration officials concerning joint finances strongly indicates fraud).  A couple that is in a legitimate marriage generally does not need to create evidence that they are in a legitimate marriage.

Evidence that Ath and Angie shared a residence is likewise very shaky.  *See Manor v. Mayorkas*, No. 20-35720, 2021 WL 4777000, at *1 (9th Cir. Oct. 13, 2021) (rejecting challenge to application of § 1154(c) where there was "scant and conflicting evidence of Oren and Brace's courtship and conflicting evidence as to whether they ever

---

[6]*Cf. Meda-Morales v. Mukasey*, 293 F. App'x 431, 432 (8th Cir. 2008) ("where BIA affirms IJ's decision and incorporates IJ's rationale or repeats condensed version of IJ's reasons, reviewing court may look to IJ's decision for more complete explanation of BIA's grounds").

cohabitated"), *cert. denied*, 142 S. Ct. 1675 (2022).  According to Ath and other affiants, after Ath arrived in the United States, he and Angie first lived together at 992 Earley Lake Curve in Burnsville.  AR 154.  Due to a fire in the garage in September 2008, they then relocated to a "Burnsville Parkway apartment" (the address for which does not appear in the record).  AR 154; ECF No. 40 at 2.  Finally, in May 2009, they rented a residence at 15314 Flower Way in Apple Valley, where Ath lived with Angie and her child until Ath moved out about a month later.  AR 154, 342, 575.

At their March 2009 interview, however, both Ath and Angie testified that they were living together at 992 Earley Lake Curve, and Angie had obtained a driver's license with that address just a few weeks before.  AR 5, 330.  Similarly, Angie and Ath's joint 2008 state and federal tax returns (which were prepared in March 2009) identify their address as 992 Earley Lake Curve.  AR 576–77, 580–81.  These statements and actions are inconsistent with Ath's and others' representations that Ath and Angie had moved out of 992 Earley in September 2008 and were living in an apartment on Burnsville Parkway at this time.

Another set of inconsistencies relate to a lease that Angie held from February 2008 through April 2009 on an apartment on Greenhaven Drive in Burnsville.  AR 337–38, ECF No. 40 at 1.[7]  Channica has not pointed to anything in the record that

---

[7]The record indicates that the lease was for a unit in a complex called

(continued...)

would explain why Angie held a lease on this apartment when she was supposedly living with Ath elsewhere.  In a 2016 affidavit, Ath contended that Angie had rented 12100 23rd Avenue South for her sister, which is why (according to Ath) the driver's license that she presented during the March 2009 interview bore that address. AR 976–77; *see also* AR 5.  This does not explain the Greenhaven Drive lease, however. Moreover, Channica has not cited any record of Angie holding a lease for 12100 23rd Avenue South, which, notably, is where Angie's mother was living as of July 2007. AR 85–86.

There are also several anomalies concerning the Apple Valley residence.  In April 2009, as the (unexplained) lease on the Greenhaven Drive apartment was expiring, Angie and two individuals named Yord T. and Vanthanakone T. applied for the Apple Valley lease.  AR 339–42.  The applications list Angie, her child, and her cousin Sunny N. as residents.  AR 339–40.  The lease itself also lists Yord T. and Vanthanakone T. as residents.  AR 342.  In June 2009, investigators conducted a site visit at the Apple Valley residence and encountered Sunny, who denied that he lived there.  AR 5.  Although Ath claims that he lived at the Apple Valley residence until early June, his name does not

---

[7](...continued)
"Southwind Village Apartments."  AR 337–38.  A subsequent filing from Channica indicates that the complex is located on Greenhaven Drive.  ECF No. 40 at 1.

appear on either the lease applications or the lease itself.  It is notable that Yord T. and Vanthanakone T. have the same last name as Jimmy T., the father of Angie's children.

In addition, at various times, Ath has claimed that he lived at the Apple Valley residence for eight months before moving out in the middle of 2009.  AR 6, 465, 911.  He has also represented that he continued to live at the Apple Valley residence as late as November 2009.  AR 207.  These representations are inconsistent with the documents showing that the lease began on May 1, 2009, and are also inconsistent with Ath's statements that he lived on Burnsville Parkway after moving out of 992 Earley Lake Curve in September or October of 2008 and moved out of the Apple Valley residence in June 2009.

To be sure, there is evidence tending to show that Ath and Angie's marriage was bona fide.  The record contains some documentation supporting their marriage, such as their 2007 and 2008 joint tax returns and insurance documents designating Angie as Ath's beneficiary.  Most significantly, the record contains multiple affidavits from friends, relatives, and coworkers, all attesting, with various levels of detail and personal knowledge, to the genuine nature of the marriage.  USCIS considered these affidavits and other favorable documentary evidence, but ultimately found that they were insufficient to overcome the strong evidence of fraud.  AR 911–13.

The Court cannot say that this determination was arbitrary or capricious. "[A]ffidavits alone will generally not be sufficient to overcome evidence of marriage fraud in the record without objective documentary evidence to corroborate the assertions made by the affiants." *Singh*, 27 I. & N. Dec. at 609. Many of the affiants repeat the details of Angie's and Ath's living arrangements, but as discussed above, there are many inconsistencies in the record concerning these arrangements, some of which are strongly indicative of an intent to deceive. Under the circumstances, the agency could permissibly choose to give little weight to the evidence that Ath and Angie's marriage was legitimate. *See Sholanke v. USCIS*, 854 F. App'x 23, 27–28 (6th Cir. 2021) (it was not arbitrary or capricious for the agency to determine that "bank statements, tax forms, insurance policies, photographs, and statements from friends and family" were insufficient to overcome evidence of fraud); *Risoli v. Nielsen*, 734 F. App'x 61, 63 (2d Cir. 2018) ("Attempts to explain or reconcile conflicting accounts, absent competent objective evidence pointing to where the truth, in fact, lies, will not suffice." (cleaned up)); *Singh*, 27 I. & N. Dec. at 609 ("evidence that the parties knowingly and deliberately attempted to mislead or deceive immigration officials regarding their cohabitation, joint finances, or other aspects of the marriage strongly indicate fraud").

As USCIS's determination was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"  5 U.S.C. § 706(2)(A), the Court grants the government's motion for summary judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion for summary judgment [ECF No. 21] is DENIED.

2. Defendants' motion for summary judgment [ECF No. 29] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 4, 2022

Patrick J. Schiltz, Chief Judge
United States District Court